343 So.2d 740 (1977)
Arthur NELSON, Jr., et ux., Plaintiffs-Appellants,
v.
Dr. Ronald H. MARRUS et al., Defendants-Appellees.
No. 13140.
Court of Appeal of Louisiana, Second Circuit.
February 14, 1977.
*741 George T. Anderson, and C. Don McNeill, Shreveport, for plaintiffs-appellants, Arthur Nelson, Jr. and Mrs. Corine Nelson.
Cook, Clark, Egan, Yancey & King, by Sidney E. Cook, Shreveport, for defendantsappellees, Dr. Ronald H. Marrus, et al.
Before PRICE, MARVIN and JONES, JJ.
MARVIN, Judge.
In this medical malpractice action, plaintiffs appeal the dismissal of their demands on defendants' motion for summary judgment. We find the summary judgment to have been improperly granted and reverse and remand.
The 32-year-old plaintiff wife, Mrs. Nelson, was a patient of defendant, Dr. Marrus, during and after her pregnancy. She miscarried on August 1, 1974, about the fifth month of her term, as she had done in five previous pregnancies. She saw Dr. Marrus four or five times during the next 35 days for hemorrhaging and fever. When the hemorrhaging became more profuse ("massive"), a hysterectomy became necessary and was performed on September 6, 1974, by Dr. Marrus' partner, Dr. Dyess. Mrs. Nelson's recovery from the surgery was uneventful.
Plaintiffs do not contend Dr. Marrus was negligent with respect to his treatment before the miscarriage or with respect to the hysterectomy. Plaintiffs' contentions of negligence generally relate to Dr. Marrus' treatment of Mrs. Nelson during the 35-day period before the hysterectomy and specifically in his allowing the placental material to remain in the womb a prolonged time following the miscarriage, the presence of which medically necessitated the hysterectomy.
In support of the motion for summary judgment, defendants (Dr. Marrus and his malpractice liability insurer) filed affidavits with hospital and medical records attached. Essentially, Mrs. Nelson's treatment was shown to be as follows:
Because of her history and symptoms, Dr. Marrus performed a "cerclage of cervix" on July 17, 1974, in an effort to bring Mrs. Nelson's pregnancy to term. This procedure did not succeed and on August 1, Mrs. Nelson was readmitted to the hospital where she delivered a stillborn fetus. Manual removal of some placental material was thereafter accomplished. Suction curettement was then performed to remove an even larger quantity of placental material. Dr. Marrus contends he prescribed birth control pills thereafter at the request of Mrs. Nelson for prophylatic purposes to prevent any further pregnancy until Mrs. Nelson was physically able to undergo a tubal ligation which she requested to be performed.
Mrs. Nelson contends she saw Dr. Marrus about August 5, 1974, at which time he advised her to sit in a tub of hot water twice a day for her complaints of excessive hemorrhaging; that she saw him with similar complaints about August 9 and August 14; that he took a tissue sample for laboratory examination and gave her a 21-day supply of birth control pills, she says for the purpose of "pushing out" the placental material; that on September 3, Dr. Marrus gave her an additional 21-day supply of birth control pills; and that on September 5, her hemorrhaging greatly increased, causing Dr. Marrus to recommend the hysterectomy. Dr. Marrus performed suction and then sharp curettage on Mrs. Nelson on September 5 in an attempt to stop the *742 hemorrhaging and avoid the hysterectomy. Mrs. Nelson denies she requested or that she had any conversation with Dr. Marrus about a tubal ligation, and contends that Dr. Marrus knew of her constant blood loss and that she was not having sexual relations with her husband at any time during the 35-day period.
Besides the joint affidavit of Dr. Marrus and Dr. Dyess, defendants submitted the affidavit of a Shreveport gynecologist and the affidavit of the hospital pathologist. The gynecologist based his affidavit on the medical records of Mrs. Nelson. He stated:
"Mrs. Nelson apparently had a condition which could be diagnosed as placenta accreta which means that the placental material has grown to the wall of the uterus and will not separate spontaneously or through accepted medical procedures."
The gynecologist then says if the placenta accreta does not atrophy then a hysterectomy is necessary to prevent further bleeding.
The pathologist, by affidavit, states that his examination of the placental material in the uterus after the hysterectomy reveals features which "are consistent with the diagnosis of placenta accreta." He concludes on this point that the "proper diagnosis" in Mrs. Nelson's case is "not limited to . . ." but ". . . includes placenta accreta." The pathology report, made some six months before the pathologist's affidavit, summarizes the pathological findings or diagnosis to include,
"Retained placenta . . . and possible partial accreta appear indicated by the gross and microscopic findings."
Plaintiffs submitted in opposition to the motion for summary judgment the affidavit of a medical doctor in general practice with 18 years "fairly exclusive" experience in obstetrics and gynecology. He opined, from the operative and pathology reports, that the first curettage of Mrs. Nelson "was not adequately done . . . and that it fell below the standard of care which required a reasonably good cleaning out of the uterus." It was his opinion that ". . [too] much retained placenta was left behind."
The trial court was of the opinion that the sole problem was placenta accreta and that plaintiffs' affidavit did not approach the issue of placenta accreta, but was limited to the issue of retained placenta, which as we understand, requires a different course of treatment because, unlike placenta accreta, the retained placenta does not continue to grow into the wall of the uterus. The record does not support the lower court's conclusion that there was no genuine issue of a material fact on the question of the doctors' negligence.
The fact that a trial judge has grave doubts that a litigant will meet his burden of proof at a trial is not sufficient to sustain a motion for summary judgment. Warden v. Southwest Louisiana Hospital Association, 300 So.2d 590 (La.App.3d Cir. 1974).
We have recognized that C.C.P. 967 is patterned after Rule 56 F.R.C.P. and that decisions of the federal courts on the question of summary judgments may be appropriate for our consideration. Jones v. Davis, 233 So.2d 310 (La.App.2d Cir. 1970). See also Hidalgo v. General Fire & Casualty Company, 254 So.2d 493 (La.App.3d Cir. 1971). In the latter case, the affidavit of a medical expert expressing his opinion as to medical causation on the basis of his training and experience was held not to meet the "personal knowledge" requirement of C.C.P. 967.[1] Thus, it was improper for the lower court to have considered the opinion affidavits of defendants' gynecologist and plaintiffs' gynecologist based solely on their respective training and experience and review of the medical records, even though their opinions would have been admissible *743 at trial. See also Warden v. Southwest Louisiana Hospital Association, supra. The affidavit of defendants' pathologist, to the extent based on his examination of the tissue, was within his "personal knowledge," but as noted, it is not limited to either diagnosis (placenta accreta or retained placenta) exclusive of the other.
It has also been held that a litigant's motion for a summary judgment may not be supported [solely] by the litigant's own affidavit.
"`* * * the mere fact that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact.'" Sartor v. Arkansas Natural Gas Corporation, 321 U.S. 620, 64 S.Ct. 724, 729 (1944).
In McWhiney v. Travelers Insurance Company, 343 So.2d 736 (La.App.2d Cir. 1977), rendered this date, we recognized the holding in Odom v. Hooper, 273 So.2d 510 (La.1973):
"* * * All doubt concerning dispute as to a material issue of fact must be resolved against granting the motion for summary judgment and in favor of trial on the merits. . . . It is well settled that a motion for summary judgment is not to be used as a substitute for trial. If there is any doubt concerning an absence of dispute as to a material fact, a motion for summary judgment must be denied and the matter resolved in favor of trial on the merits . . ." 273 So.2d 510, 515.
At defendants' cost, the judgment below sustaining defendants' motion for summary judgment is reversed. We remand for further proceedings.
Reversed and remanded.
NOTES
[1] C.C.P. 967 reads in part:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits * * *"